IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TODD PARRISH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 10-1309 |
| v. ) | |
| ) | Judge David S. Cercone |
| COMISSIONER OF ) | Magistrate Judge Maureen P. Kelly |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that the Court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment, and affirm the decision of the administrative law judge ("ALJ").

### II. REPORT

**A.   BACKGROUND[1]**

**1. General**

Todd Parrish ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for Disability Insurance Benefits ("DIB") and

---

[1] In his Motion, Plaintiff limits his argument to errors committed by the ALJ when determining what disabling limitations were attributable to Plaintiff's mental impairments. (ECF No. 11). The Court, therefore, will limit its discussion of the record to those facts relevant to Plaintiff's mental impairments, only.

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381 - 1383f ("Act"). Plaintiff filed for benefits on September 6, 2007, claiming an inability to work due to disability as of September 30, 2004. (R. at 150 – 54).[2] He later amended his onset date to be May 12, 2007. (R. at 34). This matter comes before the Court on cross motions for summary judgment. (ECF Nos. 10, 12).

Plaintiff was born on June 28, 1963, and was forty six years of age at the time of his administrative hearing. (R. at 36). Plaintiff lived alone in an apartment and had a girlfriend. (R. at 36). Plaintiff had a twelfth grade education, but no post-secondary education or training. (R. at 36). He had struggled with substance abuse issues, and claimed to have been clean and sober since his onset date. Prior work included positions as a cook and security guard. (R. at 40 – 41, 44). Plaintiff had not worked since approximately 2004. (R. at 40). His primary source of income was welfare, and he received healthcare through the state. (R. at 50).

**2. Treatment History**

Plaintiff was treated by physician assistant Linda Von Bloch, P.A. between June 2005 and April 2006. (R. at 371 – 76). Plaintiff's depression and substance abuse were frequently noted. (R. at 371 – 76). Plaintiff was attempting to engage in drug and alcohol rehabilitation at the time. (R. at 371 – 76). Ms. Von Bloch opined that Plaintiff's attempted recovery failed. (R. at 371 – 76).

Plaintiff was seen in the emergency department of Mercy Hospital in Pittsburgh, Pennsylvania, on May 17, 2006. (R. at 294). Plaintiff was treated for a lip laceration of unknown cause. (R. at 294). At the time, Plaintiff was homeless and reported being an alcoholic

---

[2]     Citations to ECF Nos. 15 – 15-12, the Record, *hereinafter*, "R. at __."

and experiencing suicidal ideation. (R. at 294 – 95). Plaintiff expressed an interest in becoming sober, and was admitted for inpatient treatment. (R. at 294 – 95).

On May 25, 2006, Plaintiff underwent a clinical psychological disability examination conducted by Steven Pacella, Ph.D. on behalf of the Bureau of Disability Determination. (R. at 300 – 05). Dr. Pacella observed Plaintiff and reviewed his medical records. (R. at 300 – 05). He noted that Plaintiff was passively cooperative and exhibited no significant peculiarities of appearance. (R. at 300 – 05). He was alert and oriented, exhibited a neutral mood and mildly restricted range of affect, exhibited normal speech, maintained productive, clear, and coherent stream-of-thought, and showed some difficulty with remote memory, limited insight, and borderline judgment. (R. at 300 – 05). Plaintiff's mathematics skills were at a low to borderline level, he had an exceedingly limited fund of information and verbal concepts, and he had difficulty with judgment and problem solving questions. (R. at 300 – 05).

Plaintiff reported that he suffered from depression, and was maintained on a variety of prescription medications. (R. at 300 – 05). Plaintiff also admitted to a continuing history of drug and alcohol abuse. (R. at 300 – 05). He reported no detoxification or rehabilitation attempts aside from two Narcotics Anonymous and Alcoholics Anonymous meetings twice per week, and counseling once per month. (R. at 300 – 05). Plaintiff did indicate that he had a number of past psychiatric admissions – most recently in 2005 for suicidal ideation. (R. at 300 – 05). Plaintiff described working a number of jobs, including a position as a security guard and positions in the fast-food industry, but could not remember the reasons for his terminations or even how many jobs he actually had held. (R. at 300 – 05). Plaintiff felt that he could not work due to physical limitations. (R. at 300 – 05). Dr. Pacella noted that Plaintiff reported independence in most activities of daily living and that he was capable of self-care and utilization of mass-transit. (R.

at 300 – 05). Plaintiff reported a number of legal issues in the past, but denied that he had been involved in any assaultive behavior. (R. at 300 – 05).

Dr. Pacella diagnosed Plaintiff with polydrug dependence, and that contingent upon Plaintiff's abstinence from drugs and alcohol, he would not likely be bipolar. (R. at 300 – 05). Dr. Pacella's prognosis was guarded. (R. at 300 – 05). Dr. Pacella concluded, however, that assuming Plaintiff was motivated and avoided substance abuse, he would be capable – psychologically – of maintaining gainful employment. (R. at 300 – 05).

On August 10, 2006, state agency consultant Edward Jones, Ph.D. completed a mental residual function capacity ("RFC") assessment of Plaintiff. (R. at 313 – 16). Dr. Jones found that Plaintiff was only moderately to not significantly limited in all areas of functioning. (R. at 313 – 16). Plaintiff was diagnosed with affective disorders and substance addiction disorders. (R. at 313 – 16). Dr. Jones indicated that Plaintiff was capable of maintaining gainful employment. (R. at 313 – 16). Based upon a review of the medical evidence, Dr. Jones believed that although Plaintiff had repeatedly failed attempts at rehabilitation, he was otherwise capable of understanding, retaining, and following simple job instructions, could make simple decisions, could ask simple questions and accept instruction, and had only some limitation in dealing with work stress and the public. (R. at 313 – 16).

Plaintiff was admitted to Mercy Inpatient Behavioral Health in Pittsburgh, Pennsylvania on December 1, 2006. (R. at 331 – 37). Plaintiff was being treated for depression, suicidal ideation, and alcohol addiction. (R. at 331 – 37). He was diagnosed with depressive disorder, alcohol dependence, cocaine dependence, nicotine dependence, and cannabis abuse in remission. (R. at 331 – 37). Plaintiff's stressors were determined to be severe, and he exhibited chronic drug and alcohol addiction with poor compliance and poor insight. (R. at 331 – 37). He had

failed past stints in detoxification and rehabilitation programs. (R. at 331 – 37). Plaintiff was given a global assessment of functioning[3] ("GAF") score of 50. (R. at 331 – 37).

Plaintiff went through detoxification while admitted at Mercy. (R. at 331 – 37). Once Plaintiff had gone through withdrawal, he continued to feel depressed. (R. at 331 – 37). He was reclusive, guarded, and withdrawn, and engaged in only minimal participation with groups and activities. (R. at 331 – 37). He eventually became more interactive with Mercy staff and other patients, and no aggression or behavioral problems were noted. (R. at 331 – 37). Plaintiff was discharged on December 8, 2006 in a stable and improved condition. (R. at 331 – 37).

Orthopedic physician John S. Beachler, M.D. examined Plaintiff on June 7, 2007. (R. at 351). Dr. Beachler noted that Plaintiff had a serious drinking habit. (R. at 351). Plaintiff had attempted to minimalize the severity of his drinking; however, following treatment for a number of injuries attributable to intoxication, Dr. Beachler concluded that Plaintiff's substance abuse was significant. (R. at 351).

Physician Andrew S. Hall, D.O. was visited by Plaintiff on July 11, 2007. (R. at 367 – 70). Dr. Hall indicated that Plaintiff had not been seen at his office for over one year. (R. at 367 – 70). Dr. Hall also reported that Plaintiff asked a nurse for a refill of a Vicodin prescription from his orthopedic physician, and that Plaintiff believed that he was incapable of working. (R. at 367 – 70). Plaintiff claimed that he had been drug and alcohol free since June 7, 2007. (R. at

---

[3] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

367 – 70). Dr. Hall indicated that Plaintiff had been diagnosed with personality disorder and was under the care of psychiatrist Brenda Freeman, M.D. (R. at 367 – 70).

The record indicated that Plaintiff had been receiving treatment for his psychological condition at Mercy Behavioral Health since February 1, 2006, and while there, was under the care of Dr. Freeman. (R. at 402 – 07). Mercy's records provided that Plaintiff was found to be violent while drinking. (R. at 398). Progress reports from August and November of 2007 showed that Plaintiff had made little or no progress with his diagnosed polysubstance dependence, nicotine dependence, and major depressive disorder. (R. at 402 – 07). Plaintiff had been assessed GAF scores of 40 – 45. (R. at 402 – 07). As treatment progressed with Dr. Freeman at Mercy, Plaintiff did not appear to suffer medication side effects. (R. at 446 – 91). He also expressed a gradual improvement in his condition, corroborated by his treating sources. (R. at 446 – 91).

On January 11, 2008, Plaintiff was examined by Sharon R. Wilson, Ph.D. on behalf of the Bureau of Disability Determination. (R. at 420 – 27). Plaintiff was noted to have been seen for past psychiatric issues at a number of local hospitals. (R. at 420 – 27). Dr. Wilson also noted Plaintiff's treatment history with Dr. Freeman. (R. at 420 – 27). At the time of his examination, Plaintiff reported that he had attempted a number of jobs in the past, but without success. (R. at 420 – 27). He described struggling with a drug and alcohol problem, and claimed to have been in recovery since May 2007. (R. at 420 – 27). Dr. Wilson found that past treatment records indicated a history of poor compliance. (R. at 420 – 27).

Dr. Wilson described Plaintiff's appearance as disheveled, and his behavior as unusual. (R. at 420 – 27). Plaintiff appeared to be drugged and his responses were slow. (R. at 420 – 27). She was unsure whether this was due to his current psychiatric medication dosage. (R. at 420 –

27). Plaintiff's mood appeared to be depressed and his thought processes were slow. (R. at 420 – 27). Plaintiff was alert and oriented, and had reasonable recall ability. (R. at 420 – 27). He was unable to do multiplication. (R. at 420 – 27). Dr. Wilson believed that Plaintiff's social maturity, judgment, and insight were limited. (R. at 420 – 27). Plaintiff explained to Dr. Wilson that his activities of daily living were mostly limited by his physical pain, and his social activities were limited due to anxiety, difficulty communicating, and anger. (R. at 420 – 27).

Dr. Wilson diagnosed depression and alcohol dependence. (R. at 420 – 27). His prognosis was considered poor due to a long history of psychological disorder, as well as drug and alcohol issues. (R. at 420 – 27). Plaintiff's history included arrests for physical altercations, public drunkenness, and driving while under the influence of drugs or alcohol. (R. at 420 – 27). Dr. Wilson felt that Plaintiff's ability to adapt to stressful situations, react to conflict, and maintain attention were all limited. (R. at 420 – 27). Specifically, Plaintiff would be markedly limited in responding appropriately to work pressures in a usual setting, and responding to changes in a routine work setting. (R. at 420 – 27). Plaintiff was, however, capable of understanding, retaining, and following instruction. (R. at 420 – 27). He could maintain attention and perform simple, repetitive tasks. (R. at 420 – 27).

Douglas Schiller, Ph.D. performed a mental RFC assessment of Plaintiff on February 5, 2008. (R. at 428 – 30). Dr. Schiller diagnosed affective disorders, personality disorders, and substance addiction disorders. (R. at 428 – 30). Yet, he found Plaintiff to be no more than moderately to not significantly limited in all areas of functioning. (R. at 428 – 30). Dr. Schiller found that Plaintiff was likely capable of carrying out very short, simple instructions, and could work. (R. at 428 – 30). He gave Dr. Wilson's assessment great weight, and considered his

assessment to be in accord with Dr. Wilson's, although his findings did not include marked limitations – as Dr. Wilson's had. (R. at 428 – 30).

The last psychiatric progress note on record from Dr. Freeman, on June 30, 2009, indicated that Plaintiff was alert and oriented, was appropriately dressed, and exhibited good eye contact, normal speech, and normal motor activity. (R. at 446 – 47). Plaintiff's affect was euthymic and had a good range. (R. at 446 – 47). Plaintiff's thoughts were organized, he was cognitively intact, and he exhibited good attention, memory, language function, insight, and judgment. (R. at 446 – 47). Dr. Freeman noted that Plaintiff continued to drink occasionally, and advised that Plaintiff abstain from all alcohol consumption. (R. at 446 – 47). Dr. Freeman also noted that Plaintiff was not engaging in therapy for stress management and coping skills, and advised that Plaintiff restart such therapy. (R. at 446 – 47).

### 3. Administrative Hearing

Plaintiff testified that he believed that he was unable to work because he suffered the ill-effects of bipolar disorder, depression, obsessive compulsive disorder, and borderline personality disorder. (R. at 37). Specifically, Plaintiff alleged that his mental conditions caused significant anxiety, loss of sleep, mood swings, and physical outbursts/ altercations. (R. at 37 – 39, 48, 60). Plaintiff testified equivocally about his ability to work well with other people, but noted that he had been jailed and fined in the past for physical altercations. (R. at 39, 52, 60). He also claimed to keep to himself. (R. at 52). Plaintiff stated that he visited his psychiatrist, therapist, and primary care physician, each, once a month. (R. at 56).

A normal day for Plaintiff began at around four or five o'clock in the morning and ended between nine and twelve in the evening. (R. at 47). Activities of daily living included washing dishes, making the bed, vacuuming/ sweeping/ mopping, taking out the trash, and grocery

shopping once a month. (R. at 45 – 46). Plaintiff stated that his family often helped him with household chores. (R. at 45). Plaintiff watched television, listened to the radio, read, and played games. (R. at 46). He also attended church, visited friends, and took walks on occasion. (R. at 46 – 49). While Plaintiff had a driver's license, he did not drive – preferring to take public transit. (R. at 47). Plaintiff could care for himself, independently. (R. at 47).

Plaintiff testified that his psychiatric medications had numerous side-effects, including drowsiness, dizziness, constipation, upset stomach, heartburn, and aches and pains. (R. at 50). The medications were alleged to be minimally effective in reducing depression and anxiety. (R. at 59). He also claimed that his mental condition prevented him from going out as often as he once had, and gave him difficulty with memory and concentration. (R. at 53). He frequently felt unwanted, worthless, and depressed. (R. at 53). Typically, Plaintiff did not leave his residence for three or more days at a time, because he did not want to deal with other people and had difficulty with stress. (R. at 59 – 60).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience could perform a significant number of jobs in the national economy if limited to light exertional work requiring the lifting and carrying of no more than twenty pounds, only limited interaction with the public, peers, and supervisors, only occasional balancing, climbing, squatting, crawling, and walking, only limited complex decision making, changes in the work setting, and detailed instruction, and no need to cope with stress other than in emergency situations. (R. at 64 – 65).

The vocational expert replied that such a person would be capable of working in "bench assembly," with approximately 737,000 positions available in the national economy, as a "document preparer," with 300,000 positions available, or as a "machine feeder," or "off bearer,"

with 723,000 positions available. (R. at 65). Plaintiff's attorney then asked the vocational expert whether a significant number of jobs would still exist in the national economy if the hypothetical person's limitations were those found by Dr. Wilson in her assessment. (R. at 66).

The vocational expert indicated that if a person were so limited, no jobs would be available. (R. at 67). Plaintiff's attorney then inquired whether jobs would be available if the hypothetical person was physically aggressive with co-workers, frequently verbally argumentative with co-workers, off-task ten percent or more of each workday, or was absent two or more times per month on a continuing basis. (R. at 67). The vocational expert responded that in all such instances, no jobs would be available to the hypothetical person. (R. at 67).

**B.　ANALYSIS**

**1. Standard of Review**

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[4] and 1383(c)(3)[5]. Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. §706. When reviewing a decision, the

---

[4]　Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[5]　Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). In short, the court can only test the adequacy of an ALJ's decision based upon the rationale explicitly provided by the ALJ; the court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

To be eligible for Social Security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step

sequential analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

### 2. Discussion

The ALJ determined that Plaintiff suffered medically determinable severe impairments in the way of chronic neck pain, back pain, right hip pain secondary to fractured right hip, left ankle pain status post fracture, pain disorder, depression, and polydrug dependence/ abuse in remission as of May 2007. (R. at 16). Despite his limitations, Plaintiff was found capable of light exertional work limited to lifting and carrying no more than twenty pounds, only occasional balancing, climbing, squatting, and walking, only minimal interaction with the public, co-workers, and supervisors, only limited complex decision making, detailed instruction, and workplace change, and involving stress only in emergency situations. (R. at 21). Based upon the testimony of the vocational expert, the ALJ concluded that even with such limitations, Plaintiff was capable of engaging in a significant number of jobs in the national economy, and was, therefore, ineligible for benefits as of his claimed disability onset date. (R. at 29 – 30).

Plaintiff objects to the ALJ's determination, arguing that the ALJ erred in failing to give due consideration to the opinion of Dr. Wilson, by relying upon evidence pre-dating Plaintiff's onset date by two years, and by selectively considering only high GAF scores. (ECF No. 11 at 6 – 23). As a result, the ALJ's RFC assessment and hypothetical to the vocational expert were correspondingly flawed. (*Id.*). Defendant counters that Dr. Wilson's opinions were unduly severe relative to the record as a whole, that the ALJ's analysis was not limited solely to certain evidence pre-dating Plaintiff's alleged onset by two years, and that the GAF scores Plaintiff wishes the ALJ to consider were not relevant to the period of Plaintiff's alleged onset date. (ECF

No. 13 at 11 – 25). As such, the ALJ's decision was allegedly supported by substantial evidence and the hypothetical and RFC assessment were not flawed. (*Id.*).

When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706). In the present case, the ALJ adequately met her responsibilities under the law.

With respect to the weight given to Dr. Wilson's report and the findings utilized by the ALJ to partially discredit it, Plaintiff argues that findings of marked limitation in responding appropriately to work pressures in the usual work setting and responding appropriately to changes in a routine work setting, were not given proper weight by the ALJ and should have precluded Plaintiff from engaging in substantial gainful activity. Contrary to Plaintiff's assertion in his motion, however, the ALJ did discuss a number of other assessments in Plaintiff's record which did not depict Plaintiff as being limited to the degree described by Dr. Wilson. (R. at 17 – 28). As noted by the ALJ, Dr. Schiller stated in February of 2008 that despite suffering from depressive disorder, personality disorder, and substance addiction, Plaintiff had only mild to moderate limitations and was capable of engaging in substantial gainful activity. (R. at 17 – 18). Dr. Pacella stated in May of 2006 that despite polysubstance dependence, Plaintiff's limitations did not preclude him from engaging in full-time employment. (R. at 18). Dr. Freeman completed

13

a number of psychiatric assessments, as well, the latest of which in 2009 did not appear to comport with the severity of Dr. Wilson's findings. (R. at 19 – 28).

Finally, the ALJ specifically addressed the findings of Dr. Wilson and thoroughly discussed the evidence from the record which was not in accord with her findings. (R. at 18 – 28). The ALJ observed that Dr. Wilson's findings were similar to those of Dr. Schiller and Dr. Pacella, with the exception of two marked limitations findings. (R. at 18 – 28). The ALJ determined that Dr. Wilson's marked limitation findings were not to be given significant weight, because both before and after Dr. Wilson's assessment, the medical record included contrary findings. (R. at 18 – 28). It was in the context of these findings that Dr. Wilson's assessment also was discredited for reliance upon subjective complaints by Plaintiff which were not supported by the record. (R. at 18 – 28). While evidence of psychological disorders was prevalent throughout the record, the ALJ noted that only Dr. Wilson indicated that those disorders, alone, created marked limitations which could preclude employment. (R. at 18 – 28).

With respect to Plaintiff's argument regarding the ALJ's treatment of GAF scores on the record, the Court notes that the ALJ made reference to one score of 55 that was assessed in March of 2009, but no others. (R. at 20). However, GAF scores do not have a direct correlation to disability requirements. *Bill v. Astrue*, 2009 WL 1765851 *1 (W.D. Pa. Jun. 22, 2009). GAF scores may be unrelated to the ability to engage in substantial gainful activity. *Id.* Without evidence illustrating that a GAF score indicated a certain degree of work-related impairment, a GAF score is not necessarily indicative of the ability to work. *Coy v. Astrue*, 2009 WL 2043491 *14 (W.D. Pa. Jul. 8, 2009) (quoting *Chanbunmy v. Astrue*, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008)). As held by the United States Court of Appeals for the Third Circuit, where a treating medical source provides a GAF score, but does not delineate whether the score was meant to

convey a certain degree of functional limitation or impairment of the ability to work, and an ALJ has otherwise reviewed and discussed accompanying findings made by the treating medical source, omission of the GAF score from explicit discussion is not necessarily error. *Gilroy v. Astrue*, 351 Fed. App'x 714, 716 (3d Cir. 2009). "A written evaluation of every piece of evidence is not required, as long as the ALJ articulates at some minimum level her analysis of a particular line of evidence." *Ruiz v. Astrue*, 2009 WL 349731 *2 (E.D. Pa. Feb. 12, 2009) (quoting *Phillips v. Barnhart*, 91 Fed. App'x 775, 780 n. 7 (3d Cir. 2004)).

There is no indication in the ALJ's decision that the ALJ accorded the score of 55 significant weight when rendering her ultimate decision. It was mentioned in passing as one small component among many other pieces of evidence discussed by the ALJ. (R. at 20). Further, there is no indication within the reports of Plaintiff's various treating sources that the assessed GAF scores were meant to show Plaintiff's degree of functional limitation as it related to his ability to hold employment. In light of the ALJ's otherwise thorough discussion of the remainder of the record, including those portions wherein the other GAF scores were provided, the Court finds that substantial evidence supported the ALJ's denial of disability benefits, even without discussing all of the GAF scores explicitly. The Court declines to remand this case simply so that the ALJ can insert GAF scores into her decision. *See Coy*, 2009 WL 2043491 *14.

Finally, Plaintiff argues that the lack of substantial evidence supporting the ALJ's conclusions rendered her hypothetical and RFC assessment inadequate. In light of the above discussion, it is clear that the ALJ provided a thorough analysis of the medical evidence underlying Plaintiff's claim for disability benefits. Having provided significant record evidence to support her findings, this Court can conclude nothing other than that all the credibly

established medical impairments suffered by Plaintiff were properly incorporated into the hypothetical to the vocational expert by the ALJ, and were accommodated fully in the ALJ's RFC assessment. Therefore, the ALJ's hypothetical and RFC assessment were not flawed.

C.    CONCLUSION

Based upon the foregoing, the ALJ provided a sufficient evidentiary basis to allow this Court to conclude that substantial evidence supported her decision. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be denied, Defendant's Motion for Summary Judgment be granted, and the decision of the ALJ be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. ' 636(b)(1)(B) & (C), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n. 7 (3d Cir. 2011). Any party opposing objections may file their response to the objections within fourteen (14) days thereafter in accordance with Local Civil Rule 72.D.2.

*s/ Maureen P. Kelly*
Maureen P. Kelly
United States Magistrate Judge

Dated: December 13, 2011

cc/ecf: All counsel of record.